No. 18-3711, and we've seen this case before. So, counsel? Good morning, Your Honor. My name is Jay McDaniel. I represent the plaintiff's appellant in this matter. I'd like to reserve the Court's permission five minutes before we vote. That will be granted. The law does not have a narrow perspective. It has a broad perspective. And so we look at things in their entirety. We look at statutes in their entirety, and we construe them so that we don't eliminate pieces of it. We look at contracts in their entirety so that we don't disregard superfluous aspects of them or disregard language as being superfluous. We want the whole thing to work together. And we look at court opinions in their entirety, and we don't pick and choose specific provisions of that while ignoring other aspects of it because it suits our purpose. We need to, in the law, look at things so that they make sense when considered altogether. This case has been one in which the plaintiff has continually said, no, you have to look at all of the pictures, all of the pictures. You have to look at the statute, sections 101, 17 U.S.C. 101, 17 U.S.C. 201. You have to look at what it means to be a derivative order. You need to consider that in its entirety in order to come to a just conclusion that fits with the law. The same thing is true in looking at the court's prior opinion here. The district judge and the defense in this case has seized on certain provisions within that opinion but disregarded other provisions. The provision, for example, the court's language in Judge Greenaway wrote, to the extent that any subsequent work incorporated the underlying work, it's a derivative. And the authors, the joint authors of the original work have a right in any derivative works that are created from it. The other thing that you come up with in this case is if you come up with a contract in which 21 words out of a multi-page document is seized upon as having created some sort of a conveyance of a copyright that somehow strips the rights of one joint author away from the other. And he basically walks away with nothing. So you go back to the part of our prior opinion that you just referenced, the joint ownership in a derivative work. I'm not sure if you have a characterization of that holding or do you not consider it a holding. Why are you raising that point? Well, because the trial judge below, she looked at language in the opinion that discussed, and I can point it out to the Court, it's in the subsection B, Brownstein's copyrights and copyright registrations. And in particular, a sentence that says Brownstein's 2009 copyright registrations would, therefore, cover any post-1998 generations of the ETHM programs that were not covered by the 1998 settlement agreement with LSDI. Now, the defense has taken the position, well, the Third Circuit ruled on that issue. They ruled that anything that was prior to this particular settlement agreement had somehow been stripped away from Mr. Brownstein. But what does that generally mean? That this he did a significant amount of work in this area? He did. This is his work. They made certain settlement agreements, but his work continues. Well, I think at first it's true. It did continue. And the first issue is what does the statute say about a joint work? Now, if we design this table, set it aside to functionality, you and I designed this table together, and it's ours. We each own half of it. Now, if I cut out a little piece and sell it to somebody else, well, what remains is still ours. And so the argument that's been made here is that because of the settlement agreement, that it's because it stripped away a portion. And we disagree that it stripped away anything. But because it stripped away some portion of Mr. Brownstein's work, that he didn't own anything of what was left. All right. Your argument is that he didn't give up the work that he contributed. It goes beyond that. He didn't give up his ownership interest in the joint work. So Section 201 says, and sometimes it's a little counterintuitive, but Section 201 of the copyright says that joint authors are joint owners of the copyrights in the work. What does that mean? Each in the prior panel of this Court said that that means that each of them owns all of it. And the Court is not going to – it's not up to the Court to look into individual contributions once that's been made. So I can contribute a little to a joint work, but I still own all of it. I get your point. I have a question. I mean, and it goes to what Chief Judge Wolfson said. This case involves claims from May 2010 forward, right? Yes. Okay. She found that there was no evidence at all that either the ETHN material from your client was either incorporated or even still being used at that point. Where in the record can we find that his property, his copyrighted material is still being used? First of all, it's in the license agreement. It's important to recognize that the distinction that we're drawing here is that there is no requirement under the Copyright Act for Mr. Brownstein to demonstrate the continuing use of his contribution. What he needs to demonstrate is that he's the joint author of the work from which it was derived. Now, what does that mean? That means that – and you have to understand the program a little bit here. There's a process. There's a system. Wasn't that cut off in the 1998 settlement? It was not. Okay. And the reason it was not – Was there any specific recognition that it survived? Did Ms. Lindsay at any time make that kind of – She did, actually. And one need only look at her testimony at the trial court and her testimony at deposition because what happened – the facts of the case were that they left as prior employers. And so I asked when she was on the stand at trial, I said, well, when you left, you did this assignment at the time that you left, that these rights were, you know, purportedly from yourself to tap. What were you assigning? Weren't you assigning what LSDI is? I mean, wasn't that the whole point of it? She said, no. It was different. This was a different program. The tap system – and you have to look at the record, but she says the tap system, the LCID that I took with us and that we offered to other people was different than what we left behind. So our prior opinion can be read as saying the EDS is actually Lindsay's, that she's the sole author and owner of that. If that only is in the latest iteration, since May 2010, your client still is entitled to proselytizing because that's what the statute says. The statute does not allow, does not provide for things to be settled. Once it's – imagine, imagine that we each take pink and we take the blue and the green, the blue and yellow, right, and we merge it together. There's a joint work to make green. Once it's green, it doesn't come apart. If I cut something in half and take away half the green, it's still green. So Lindsay and Brownstein, when they created this work, they collaborated on it, the statute to, you know, the authority that exists in the Constitution of the useful arts and sciences to secure the authors for a period of time specifically notes and encourages collaboration. Congress had the authority. So Congress made the decision that when parties collaborate on a joint work, they are joint authors of the copyright in that work. And that includes the right to make derivative works, the right to make copies, the right to publish. So that you have in circumstance – Do they – and the right to share in the profits – And the absolute right to – the duty to account for each other. Was that taking place? I mean, where – It did until 2010. Say that again? It did until 2010. It did, okay. And again, the 1998 settlement agreement has no bearing on this issue? Completely and totally carved out. The action was filed before that settlement. Oh, I'm sorry. The 1998 settlement agreement, it does not. And there are two reasons why. First of all, the judge made an error in the date that she applied and in disregarding Lindsay's testimony. Because she applied the date of the settlement, not the date that they left. And a lot of that's covered in our brief and what it was that it was referred to. The second thing – It isn't – I mean, there were – what went to the new place was the 97 iteration of this, right? It was a – according to Lindsay, it was a version that had been prepared specifically for TAP that was different from the LSDI program. Okay. And that the undisputed testimony was that Mr. Brownstein took that. He took another product called the NAME system. He combined them into the ET that had finished the product. It was on the market. And then they settled the case. So if you look at that agreement, could anybody looking at that agreement, the LSDI settlement agreement, construe it to be an assignment of rights between the parties? Or is it simply an agreement of permitted use? I would suggest no. And I would suggest that when you look inside the agreement – Wait a minute. You said it's one or the other, and then you said I would say no. I would say no. It is not an assignment because it contains no words of conveyance. What it talks about is use. And what it – what it intended to do was to allow the parties to go on without paying damages and continue to compete with each other. There was a – there was a clear intention to waive claims.      I would just say no. All right. I would just say no. Yes. I see that I'm out of time. Well, at page 74 of our opinion – and obviously we need to look at that. Didn't we say TAP retained all rights to the EDS in any derivative works or modifications thereof? And I'm referring to page 74. Just let me find that. It's the first sentence under Section 5 there, V. 5B? I believe so. Actually, it's important to recognize that active in that case at the time was a claim for cancellation of registrations. Those registrations are valid and existent today. So I would suggest to you that it says Brownstein's copyright and copyright registrations. The Court there was looking at the issue of whether Mr. Brownstein's post-1997, post-termination of his relationship with LSCI, he actually wrote additional programs and registered those programs. And in the original case, the defendant sought to have them canceled and were unable to do so. So I would suggest to you that that is what the Court was really looking at there. We perhaps misused the word ownership. Maybe that's too broad, is that what you're saying? No. We have to distinguish. It's important to look at what's in play here. There is Ms. Lindsay's contribution to EDS, right? This is a system of rules intended at the time that it was written to be computerized. It had no commercial viability without some sort of automation. There's Mr. Brownstein who contributed the automation to it. Together, they create the LCID. So each of them does, in fact, own independent rights in EDS and ETHN and in later versions. But they – when they – once they combine together, the statute says that they are inseparable. You cannot bring them apart. So Mr. Brownstein might have, for example – Does Lindsay disagree with that? Absolutely. That they were joined? Well, you know, she disagrees in this litigation, but in numerous – on numerous occasions in the record, in licenses that she drafted, in language that she herself wrote and signed, she said they were inextricable. In? Inextricable. Inextricable. Why don't we – we'll get you back on rebuttal. We'll let your friend defend his side. Good morning, Your Honors. Jesse Brownstein on behalf of the defendants at police. I think something that jumped out at me right away was that the first decision unambiguously stated that Tina Lindsay was the owner of the EDS. Counsel and plaintiff went to great lengths in their briefing at page 20 and 21 in their opening brief. Page 6 of their reply, they called it a fiction that we were claiming that they were seeking to be co-owners of the EDS, yet that's what you just heard here today. There is no doubt that Tina Lindsay is the sole owner of the EDS, and there is – there is actually no evidence of what is being sold today having any connection to what he claims to have owned. And that's the problem. This is – this is a case about proof, and that's why Rule 56 is really the only bar that this Court needs to look to, because Judge Wolfson said, okay, what's the case that we're going to try here? What are you actually going to prove? And whether it's 1997 or whether it's 1998, there's a thing he claims to own. He says that now post-2010, it's being licensed for profit, and he's being excluded from that. So let's see what they are. Let's compare them. There's no comparison in the record. We're talking about what people stated in maybe a license agreement. We're talking about what people stated in marketing materials. We're trying to construe people's testimony. The way to actually do this is to look at the thing he's claiming to actually have ownership over, see whether or not there's any derivatives of his work in there, and then he can meet his burden. There's nothing like that. It's really just his say-so. And so that's what we're talking about when we see Judge Wolfson's decision. There's a total lack of evidence. But there was a point in time when they both got together and developed a program together. I disagree with that. You disagree with that? I disagree with that. Did he disagree that he was involved in the coding? I'm sorry. Yes, he did some coding at the direction of Ms. Lindsay, and the coding was a translation of the EDS. Well, that's kind of significant, isn't it? Well, it's very significant. I mean, our position has always been that he's not a joint author, that he's not a co-owner of anything. But even if we assume that he is at some point, how do we match that up to what's actually being licensed today? You say there was never a time when Lindsay conceded that he was a co-author of the program? No. Never a time. That never happened? There was an argument. You'll see it in the first decision in this case, before the Third Circuit. There was a purported concession by counsel that he made a contribution to the work, and that that became the LCID. We disagree that that was actually a factual finding by this Court. But nonetheless, even if there is a thing, he claims that he is a co-author of what's called the LCID, how does that move forward in time? How do we know that the thing that they're actually, that Tina Lindsay purportedly is licensing for profits, and his exclusion, is the same thing, or the derivative? The District Court had no evidence of that. The jury would hear no evidence of that. This Court, right now, can hear no record evidence. Was there evidence that there were two entirely separate programs? Well, I mean, this Court actually held that in the first decision. The EDS is separate and independent from the LCID. So if the thing that's being licensed for profit today is a derivative of the EDS, and this Court has decided that Lindsay is the sole owner of the EDS, and Plaintiff has conceded that repeatedly, that he's not seeking co-ownership of the EDS, the decision for this Court is a simple one, because he has no rights in the EDS. I think the other thing to point out, too, is that we had a trial in this case, and there was a directed verdict at the close of Plaintiff's case. The defense has actually never been heard on this case when it comes to the trial. We've never called witnesses. We have six programmers listed as witnesses. We actually never put on our defense. But yet, we're up here again for the second time where Plaintiff is saying, anoint me the co-owner of something. And how does that look when he comes back? If he is the co-owner of something, how do we still know that it's connected to anything that's being licensed for profit? There's no connection. There's no evidence to that. How about the TAP system, the T-A-P? Did Brownstein make significant contributions to that program? As a programmer, he was an employee as well as an owner of the TAP system. And again, we're talking about the actual valuable thing here is the EDS. The EDS is the thing. It's first in time. Lindsay is the sole owner. It's been around for a long time. But we've never had a case where any programs that come from that are translations of that actual idea. We can't ignore Brownstein's contribution with, you know, with his ETHN. Can we? If his ETHN — You're really minimizing it here. But it's always been a — it seems to have been a part of it, at least at one point. Right? His ETHN is in a dead programming language that works on 1950s mainframe computers. It's not used at all. But also, why are we jumping to the assumption that the thing that we make money off of has anything related to what he actually contributed? This court previously, when it sent it back, it said — this is a quote — It is possible that the post-1997 versions of the LSIT continue to employ the code created by Brownstein. But such determination would require additional factual development at trial. So we go back to do that. There's no factual development of that. There's no actual connection between the two. Did we say that was dispositive, though? Dispositive of? Of this case. Yes. I mean, that is dispositive. If he can't — No, do we say it's dispositive? No. Okay. But, I mean, he was remanded for some reason, you know, presumably so he could actually meet his proofs, which he did. And Judge Wilson was pretty clear about that. She points out that she doesn't actually have the information that she could even draw a reasonable inference that he owns something today. There's no record evidence about what the actual product he licensed is today. So — So your point is it doesn't matter whether the district court looked at the right timeframe or not, because there's no connection forward to the product that's currently on the market for which Mr. Brownstein is seeking an account. Yes. Okay. That's our position. So this — whether it's cut off by the 1998 settlement agreement, it seems as if it is. If we're referring to the LSDI program, they say, or any other programs owned or controlled by them, which would include Mr. Brownstein, it seems to me that that would cut something off. I mean, it's not that he gave something away in that settlement agreement. But the district court, if you look at Judge Wilson's decision very closely, she couldn't even tell what it was, whether or not he gave the thing away that he's now claiming continues on post-2010. When you say the thing away, you mean his coding expertise? Yes. In the LSDI settlement agreement. What did he give away? We don't have — there's actually — I mean, other than they're saying so, we don't actually know because there's no comparison of the code. There's no expert testimony to link this up. There's no reverse engineering. So that's really where we are. I'm sorry. Go ahead. He's the author of the code, and he had an opportunity to show that in the district court and say he did not. He did not. He did not. I mean, we have word process documents of zeros and ones, and we don't know. I mean, what's the connection to what's being, you know, licensed today? There absolutely is none. So how can we actually declare him the co-owner of something when no one actually can tell you what it is today? There's no record evidence of it. Actually, this wasn't stated in the briefs, but just an assumption. Discovery's done, right? Yes. Okay. Discovery's done. There's no Rule 5060 declaration filed. Okay. There's no request for actual discovery. If this case is remanded — I mean, it's almost 10 years old. It's been remanded, and if we have to engage in discovery and now get experts, it seems to me like we're up here a second time. We'll get here a third time over that. It's just completely unwieldy. Plaintiff has had his opportunity. He's not here asking for more discovery. He's here saying, I don't even want. There's no doubt that he made significant contributions to this type of language. Is that — at the beginning. In 1997, at the direction of Tina Lindsay, he did computer programming, translating what her system was. Whether that coding has actually any sophistication, whether it's independently copyrightable, we completely disagree. They continued working together for a number of years. They did? That's all true. But at one point, Ms. Lindsay's programs discontinued, Mr. Brownstein's — Oh, yes. He says that actually in his declaration. Completely? In his declaration. Yes. 2001, I mean — There was nothing left of any of the contributions that he made. Absolutely not. But there's also no evidence of that because we didn't actually get into that. That would be our defense when we tried the case. Our programmers will actually say there's no footprint, there's no fingerprint left of what Mr. Brownstein did in 1997. It's completely unusable. Or thereafter. Yes. So how do you respond to the analogy your friend made about two colors put together can't be separated? How do you respond to that? To say that something is put together and it can never be separated, that's what joint work is under the copyright law. We're not here to tell you that that's not the law. The question is what was put together and then what continues on into the future. His job was to show you, A, there's something put together, I'm an owner, and then, B, that thing is now being licensed for profit in the future or derivative of it. But there's no connection between it. So all we have is his case so that it was put together and I own it. And for him to say that he now owns the EDS because of that is just contradictory to what this court's first decision was and what he's actually briefed and basically admitted. Do you have anything more, counsel? I have nothing more unless there's further questions. Could his creative coding methodology have been used without use of the actual code? I disagree that it's creative coding methodology. It's a sorting program that pretty much anybody can do. Well, it was essential at the very beginning, wasn't it? No, because you could basically get any programmer to do this. The value of this thing is the EDS. It's not actually how you run it on a computer. Lindsay's testimony is that the EDS exists independently of anything else. So you could basically pair it with any programmer, not just his. Okay. Thank you, counsel. Okay. The first piece of evidence that the work is still being used is A328. The appendix, which is a license agreement dated September 26, 1997 for a term of 20 years in which TAP systems licensed the TAP system to Ethnic Technology. That license ran its course of 20 years from 2010 to 2017. When it expired, my client didn't get any money. He didn't get his share as the coauthor of the work that was licensed from TAP to ET. It's very simple.  It's not, therefore, licensed to any other EDS system. But it's not licensed to any other EDS system. Well, well, did the 1998 settlement agreement affect that at all? It did not. It did not. And the reason for that is in part to Lindsay's testimony, which is in the appendix at 8287 when she says LCID was a prototype developed by EDS by adding it in a particular programming language called COBOL on a particular sort of antique kind of computer called an old IBM mainframe with a particular program assigned by Tom Raskin to do the coding. And then it goes on. It says TAPS system was a new name for LCID. ETAC is LCID plus the CMR put together. That's my definition. So you don't have to go to Peter Brownstein to find the evidence. It comes out of Tina Lindsay's mouth. Continuing on, on 288, she says in the appendix, she goes on to talk about the difference between what she took from Peter Brownstein and what she left behind. We built those. Now I'm on line 17. They're now different programs. Most of the ones I was claiming were ours and those were the ones we were going to offer to Hartank were better than the ones at LCID. So they owned theirs. We owned ours. Now, the other thing I would point to is that Mr. Plankroth used the word translation a number of times. All Peter Brownstein did was translate the EDS. What is the definition of the derivative work under 17 U.S.C. 101? It includes, it is a derivative work, is a work based upon one or more preexisting works such as a translation. So to the extent that there was a translation made, it was a derivative work. And if you look at all of this about derivatives, a derivative does not take away from the prior work. It's in the statute. So if the LCID was a program and the program was licensed to TAP and TAP then licensed it to ETEC and it was used to form a new product, nothing that happens after that takes away the original work. It's right in the statute. You can't use the fact that you created derivatives. Derivatives only create copyrights in the new material that's added. It does not affect the prior work. So, again, we're dealing with, look, I understand there's something that's counterintuitive about the fact that maybe this, the portion that Peter Brownstein contributed back in 1997 is a result of the tremendous amount of advancement in technology is no longer useful. It doesn't matter because the statute rewards collaboration. It's fair because if Peter Brownstein had not contributed his time and his expertise to this project back in 1994 and 1996, it would have been a very useful academic exercise with people sitting down at a computer, going and sitting down at a notebook and going through these complicated rules one at a time. It had no value without automation. And Peter Brownstein provided the automation.      I'll leave it at that. And I'll leave it at that. Thank you. What's his best argument, that he provided sufficient evidence for a reasonable juror to find that he was the co-author of the LCID TAP program after his resignation from the services? What's his best argument? After his resignation from? The services. From the services. There was, in opposition to his motion for summary judgment, there were about 1,600 pages of documents submitted, somewhere around 60 exhibits, and his long testimony. His best argument is the fact that he holds three registrations that post-date the termination date of 1997. He holds one that's from November of 2008, which is even after the settlement agreement. It's his testimony that I work in a room by myself, and I took the TAP, and I took the name, and I made them into something new. It's the notes that we supply of the work product that occurred during that period of time. His burden is not to show the current use of his code. His burden is to show that he's a co-author of a joint work from which the current product has been derived. Any recognition by Lindsay of his cooperative work at all after 1997? Yes. Again, I think it's in the testimony. What was that? Well, a moment ago, when I talked about in that particular phrase of testimony, she talks about the fact that we made changes after 1997, that our product was better and different. Who is she referring to when she said we? She's referring to TAP systems. So she talks about ñ she talks in H-287, those programs that were the ones Peter had written at LSDI in the time frame that he was at LSDI and I was at LSDI. That's early 1996. These are all programs that he wrote after the formation of TAP. So in the testimony, you can see that the testimony is in H-287. What page is it? Yeah. We wrote or we compiled. What page is it? I'm looking at my notes, but in the appendix, the testimony is at H-287. Okay. And then also at 8439, there is a discussion that was taken at her deposition in which she testified in response to a question about what it was that they took. She says they, and she's referring to LSDI, kept ñ by then it was an older version. They kept what they had. They didn't have any rights to any of the research that I had done since then or Peter and my attempts to differentiate our system from that which they had. We had already added ñ we had already added one feature they did not have. I know it's cut off at that point, but it was a language preference, I believe. So there's very little doubt that these two worked ñ they were friends, close friends. They worked together for decades. You know, in the record, there's a ñ Cassie, your time's up, so you have to wrap up. But you became animated when we talked about summary judgment. Did you want to have a comment on ñ I'm sorry, on the discovery issue? I did. I actually did. Is the discovery ñ The case was bifurcated by Judge Pisano. That order is still in effect. At the time that this motion for summary judgment was made, I had discovery requests outstanding based on some events that had occurred recently. They were not answered. I actually ñ I included in my certification a request, my documents that went in, a 56-F request for those documents that were out there. So when you look at the procedural posture in this case, where it is, is that you have an order, but it's still in effect. It's bifurcated. Liability. We have to determine liability first. You have preservation orders that exist from 2011 to 2012 concerning documents that are in their possession. Is there any more discovery necessary on liability? I do not think so. Okay. All right. Thank you, counsel. Thank you. We'll take the case under revisement. Again, we thank counsel for their excellent briefing and their excellent argument in this very challenging case. We'd also like to meet you at sidebar, and I'd ask the clerk to adjourn for the day. Thank you. Thank you.